UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 1:16-CV-23231-MORENO/LOUIS

WHIRLPOOL CORPORATION,

    Plaintiff/Judgment Creditor,

v.

FREIGHT REVENUE RECOVERY OF MIAMI, INC.,

    Defendant/Judgment Debtor

_____/

**REPORT AND RECOMMENDATION**

**THIS CAUSE** comes upon the Court through Defendant/Judgment Debtor Freight Revenue Recovery of Miami, Inc.'s ("Freight Revenue") Renewed and Amended Motion to Dissolve Writ of Garnishment and Claim of Exemption as to the Charles Schwab Account (ECF No. 135), to which Plaintiff/Judgment Creditor Whirlpool Corporation ("Whirlpool") responded by filing a Motion to Strike and to Apply the Law of the Case (ECF No. 139). Freight Revenue timely responded to the Motion (ECF No. 141), and Plaintiff filed its Reply (ECF No. 144). The Court has carefully reviewed the Parties' submissions and is otherwise duly advised in the premises, has ruled on those issues which were not dispositive and recommended findings on those issues which would constitute case dispositive findings.

    **I.**    **BACKGROUND**

Defendant/Judgment debtor Freight Revenue is a freight bill auditor, which audits its client's freight and logistics records for overcharges. It had an agreement with Whirlpool under

1

which Freight Revenue would recover freight fees that Whirlpool had been overcharged and would retain thirty-nine percent of those funds as payment for its services. Whirlpool alleged that Freight Revenue stopped remitting payments at some point, even though it had continued collecting overcharges on Whirlpool's behalf.

Whirlpool sued Freight Revenue and its owner, Richard Dawson, in the Western District of Michigan in October 2014. Whirlpool obtained a consent judgment in the amount of $176,749 against Freight Revenue in the United States District Court for the Western District of Michigan. Whirlpool discovered that Freight Revenue had deposited checks payable to Whirlpool into Freight Revenue's bank accounts in Florida, so it filed this action to enforce the judgment in the United States District Court for the Southern District of Florida.

Whirlpool sought to garnish several bank accounts, including a Charles Schwab & Co., Inc. ("Charles Schwab") account valued at more than $800,000. Freight Revenue moved this Court to dissolve the writ of garnishment, alleging that the account was exempt from garnishment pursuant to Florida Statute § 222.21 because it contained monies belonging to a profit-sharing plan ("Plan") that Freight Revenue, by and through Dawson, established in 1984 (ECF Nos. 18, 19, 22, 31, 82-3, 82-4). The Court conducted evidentiary hearings on the motions to dissolve the writ in May and June of 2017.

Whirlpool introduced a variety of evidence to show that the Plan was not a qualified sharing plan as defined by the Internal Revenue Code ("IRC") and therefore was not exempt from garnishment under Florida Statute § 222.21. Whirlpool's pension expert, Robert Penafiel, opined that Freight Revenue had failed to meet minimum coverage requirements and that it had discriminated in favor of highly compensated employees, in violation of 26 U.S.C. § 401(a)(3) and (a)(4). Whirlpool also sought to show that Freight Revenue exceeded permissible yearly

2

contributions to the Plan, in violation of §§ 401(a) (16) and 415.

Dawson acknowledged at the hearing that he caused the Plan to purchase property that he and his wife owned, which Whirlpool argued constituted impermissible self-dealing.

Chief Magistrate Judge John O'Sullivan recommended denying Freight Revenue's motions to dissolve the writ of garnishment because the Schwab account was not maintained in accordance with the provisions of the IRC required by Florida Statutes § 222.21. Freight Revenue filed objections to Judge O'Sullivan's Report and Recommendations but did not object to his conclusion that the Schwab account was not maintained in accordance with the IRC and thus was subject to garnishment. Freight Revenue's sole objection was that the Plan assets belonged to Dawson and could not be garnished to satisfy a judgment against Freight Revenue. Judge Moreno adopted the Report and Recommendations holding that "the Charles Schwab account is simply an account holding Freight Revenue assets," which could be used to satisfy the judgment (ECF No. 97).

On November 1, 2017 the Court entered a Final Judgment in Garnishment against Charles Schwab, requiring Charles Schwab to liquidate assets in the account to satisfy an award to Whirlpool in the amount of $173,710.23 plus interest in the amount of $6.34 per day after October 2, 2017 (ECF No. 112).

Freight Revenue appealed to the Circuit Court of Appeals, arguing that the Court erred by permitting Whirlpool to garnish the account containing Dawson's assets to satisfy the judgment against Freight Revenue. The Appellate Court vacated the judgment and remanded because the Court did not adequately explain why the funds held in the profit-sharing account could be imputed to Freight Revenue. The Appellate Court remanded to expressly determine the legal owner of the assets in the Charles Schwab account.

3

After the Eleventh Circuit mandate was issued, Freight Revenue filed a Renewed and Amended Motion to Dissolve Writ of Garnishment and Claim of Exemption as to the Charles Schwab Account (ECF No. 135). In its renewed motion, Freight Revenue argued that because it submitted the Plan to a correction program of the IRS that the Plan was *now* qualified and therefore not subject to garnishment because the funds were payable to the plan participant, that is Mr. Dawson (ECF No. 135 at 4). It further argued that 1) its current compliance with the IRC made it exempt from garnishment, 2) that the Plan's tax status as an ERISA covered plan was not dispositive of whether it could be garnished, 3) that Whirlpool could not prove RICO or Fraud, 4) that the Plan's funds could not be recaptured by Freight Revenue, 5) that Richard Dawson was not personally liable for Freight Revenue's debts or judgments, and 6) that Whirlpool could not establish any evidence that Freight Revenue fraudulently transferred assets in the Plan to avoid creditors.

An evidentiary hearing was scheduled on the Motions and to take evidence on resolving the issue of ownership consistent with the mandate. In anticipation of the hearing and in response to Defendant's motion, Whirlpool moved to strike and/or exclude all evidence concerning changes to the Charles Schwab account and to the Plan that were made after the writ of garnishment was issued; and for the Court to apply the law of the case that the account was not a qualified profit-sharing plan because it was not maintained in compliance with the IRC (ECF No. 139).

Whirlpool argued that throughout these proceedings it had presented evidence to demonstrate that the Plan was not maintained in compliance with the IRC. This argument was accepted by Judge O'Sullivan when he denied Freight Revenue's Claim of exemption and Motion to Dissolve the Writ of Garnishment. Freight Revenue filed objections to that Report and Recommendation but failed to object to the finding by Judge O'Sullivan that the Plan was not

4

exempt, a finding that the District Court adopted. Additionally, the Appellate Court found that Freight Revenue had conceded that the Plan was not maintained in accordance with the IRC, and therefore was not exempt from garnishment under Florida Law.

Freight revenue responded, arguing that Whirlpool was asking the Court to make a decision that no court has ever made before, that is, whether a judgment creditor is permitted to garnish retirement assets belonging to individuals or an ERISA plan in order to satisfy a judgment (ECF No. 141). Freight Revenue additionally challenged Plaintiff's motion for failing to cite any rule or authority supporting its motion to strike; and failing to comply with Local Rule 7.1[1] (ECF No. 141).

The Court conducted hearings over three days (ECF Nos. 150, 153, 157). At the first hearing Plaintiff presented Richard Dawson and Melanie Williamson. Mr. Dawson testified to the history of the Charles Schwab account and explained his understanding of why he viewed it as a profit-sharing plan. Ms. Williamson testified that her company was hired to bring the Plan into compliance with IRS standards and submitted the Plan to the Voluntary Correction Program. The Court then reconvened the hearing at a later date at which point excerpts of Dawson's prior testimony were read into the record. After, Defendant insisted on an opportunity to depose Plaintiff's expert, which was permitted, and a third date was scheduled for a hearing. During the third hearing the Plaintiff's expert testified and Mr. Dawson was recalled to the stand.

## II. DISCUSSION

There are currently two questions pending before the Court: First is whether Freight Revenue should be precluded from advancing arguments that the Plan is exempt from garnishment

---

[1] Although the requirements of Rule 7.1 are mandatory, the Court does not recommend denying the Motion on this ground.

and thus barring the Court from considering such arguments when issuing its pending findings of facts and conclusions of law. Second is who owns the funds in the garnished Charles Schwab account.

Whirlpool's Motion to Strike (ECF No. 139) seeks two forms of relief. First, though captioned a motion to "strike," it seeks an *in limine* ruling to preclude introduction of any evidence concerning attempts to make changes to the Charles Schwab account and the purported profit-sharing plan after the writ of garnishment was issued. Second, it seeks a ruling that the law of the case establishes that the Charles Schwab account and the purported profit-sharing plan were not maintained in compliance with the IRC and are, thus, not entitled to garnishment exemption pursuant to Florida Statute § 222.21.

The undersigned did not grant the first form of relief – exclusion of evidence rendered irrelevant by virtue of a ruling on the law of the case – prior to the hearing and permitted Freight Revenue considerable latitude in introducing evidence over the course of a three-day hearing. Upon reflection, the second ground is due to be granted, as follows.

**A. The Law of the Case**

Under the law of the case doctrine, a legal decision made at one stage of litigation, unchallenged in a subsequent appeal when the opportunity existed, becomes the law of the case for future stages of the same litigation. The parties are then deemed to have waived the right to challenge that decision at a later time. *United States v. Escobar-Urrego*, 110 F.3d 1556, 1560 (11th Cir. 1997) (quoting *Williamsburg Wax Museum, Inc. v. Historic Figures, Inc.*, 810 F.2d 243, 250 (D.C. Cir. 1987). This doctrine operates to create efficiency, finality, and obedience within the judicial system. *See Litman v. Mass. Mut. Life Ins. Co.,* 825 F.2d 1506, 1511 (11th Cir. 1987). Furthermore, the law of the case doctrine bars re-litigation of issues that were decided either

6

explicitly or by necessary implication. *See Schiavo v. Schiavo*, 403 F.3d 1289, 1291 (11th Cir. 2005).

Freight Revenue claims in its response that it never conceded that the Plan was not exempt. This is factually untrue. In Judge O'Sullivan's Report and Recommendation, Judge O'Sullivan states:

> Even though the defendant has not specifically addressed whether the alleged ERISA plan is exempt, there are several reasons why the undersigned finds that the plan is not exempt. There are two reasons that are the most obvious of those reasons. The first reason is the fact that the sale of the property by the plan to Lehigh Lots was a prohibited transaction that violated Section 408(e)(2) and cause the plan to lose its tax exempt status. The second reason is the fact that Freight Revenue failed to have a certified public accountant (CPA) audited financial statement which included appraisals and statements of the investments, concerning any mortgages and purchases or sales of the property, and that Freight Revenue failed to post the necessary bond to cover the appraised value of the real estate investments made through the plan.

(ECF No. 92 at 4). Judge Moreno adopted the Report and Recommendation on September 22, 2017 (ECF No. 97). In the Order Adopting the Report and Recommendation Judge Moreno observed "Freight Revenue does not object to the Magistrate's finding that the Charles Schwab account is not exempt from garnishment. Rather the sole objection is that the account's assets are not Freight Revenue's property and thus, cannot be used to satisfy a judgment against Freight Revenue." (ECF No. 97 at 2). Judge Moreno continued in his analysis stating "[i]t is undisputed that the Charles Schwab account is not exempt from garnishment." (*id.*).

After that Order was issued, Freight Revenue appealed to the Eleventh Circuit Court of Appeals. In the Eleventh Circuit's mandate it memorialized that "Freight Revenue objected to the magistrate judge's recommendation but conceded that the Schwab account was not maintained in accordance with the IRC, and therefore was not exempt from garnishment under Florida law. Instead, Freight Revenue's sole objection was that – despite the Plan's shortcomings – the Plan

7

assets belong to Dawson and cannot be garnished to satisfy the judgment against Freight Revenue." *Whirlpool Corp. v. Freight Revenue Recovery of Miami, Inc.*, 756 F. App'x 986, 988 (11th Cir. 2018).

It is therefore clear that the issue of whether the Plan was maintained in compliance with the IRC was challenged at one point, that is prior to Judge O'Sullivan's Report and Recommendation. It was then decided by Judge O'Sullivan, affirmed *de novo* by Judge Moreno, and noted by the Eleventh Circuit Court of Appeals. It was then not objected to both at the district court level and at the appellate level. The law of the case established that the Charles Schwab account was not maintained in compliance with the IRC and is thus not entitled to the garnishment exemption pursuant to Fla. Stat. § 222.21.

### B. Freight Revenue Owns the Funds

While the law of the case doctrine establishes that the account was not maintained in compliance with the IRC, that, the Court of Appeals noted, is not determinative of the question of who owns the funds in the account. *See Whirlpool*, 756 F. App'x at 990. The Court of Appeals' mandate required this Court to examine the alleged Plan and determine "whether a valid plan exists and the legal character of the account." *Id.* at 989. Upon review of the evidence, including the agreement creating and purporting to administer the Plan ("Plan document") and for the reasons set forth below, I find no valid plan exists, or has existed since at least 2012 and that the account has been a general operating account since at least that time.

Under ERISA, money, given by a company for the benefit of its employees through a qualified profit-sharing plan, becomes an asset of the beneficiaries. In order to qualify as a profit-sharing plan pursuant to ERISA, the plan must adhere to the requirements as set forth by the United States Treasury. *See* 26 CFR § 1.401-1(a)(1), (a)(3), (b)(1), and (b)(3). It must be maintained and

operated for the exclusive benefit of employees, not favor officers and shareholders, utilize a predetermined formula for contributions, must not exceed certain contribution limits, be updated regularly, and be communicated to the employees. *Id*.

Freight Revenue's purported Plan met none of these criteria since at least 2012. Instead, the purported Plan had no employee participants other than Richard Dawson since that time, Freight Revenue failed to adopt amendments throughout the years as required by law, monies were deposited into the account that vastly exceeded the statutory maximums, the purported Plan lacked any adherence to the Plan's own Plan document, and Freight Revenue treated the account like a general operating account.

### a. Employee Participants

Freight Revenue originally claimed that the sole participant, and thus sole owner of the funds, was Richard Dawson. It relied on this position to argue that because a judgment against Dawson, individually, was never entered that the Plan was not subject to a writ of garnishment because the funds belonged to him personally. After the Court found, and Freight Revenue conceded, that the Plan was not maintained in compliance with the IRC, Freight Revenue amended their position claiming to have identified nine individuals it claims were Plan participants.

At the hearing on July 30, 2019, Freight Revenue presented the testimony of Melanie Williamson, ERPA. Ms. Williamson's firm was hired to "bring [Freight Revenue's] profit-sharing plan completely up to code." (ECF No. 164 at 71:4). Ms. Williamson testified that she had identified nine individuals whom she considered eligible for participation. However, for the reasons stated below, the Court does not credit Ms. Williamson's determination.

Ms. Williamson's firm was hired in 2016, after the initiation of these proceedings, to update the Plan documents. She testified that she did not have personal knowledge of what occurred at

Freight Revenue or with the Plan prior to her involvement around 2016 or 2017 (ECF No. 164 at 205:14-21). She then testified that she identified Plan participants by examining the Plan's documents and retroactively applying criteria to determine who met the qualifications to be a Plan participant. Ms. Williamson testified that these individuals had been recently notified that they were participants in this Plan, but she was unaware if any had ever responded acknowledging receipt or attempted to withdraw their distribution.

The Court does not credit Ms. Williamson's testimony purporting to identify other employees as Plan participants. Relying on Dawson and the Plan document, Williamson has deduced that other employees *should have* been included as Plan participants; despite the absence of any contemporaneous documentation that the Plan recognized those individuals as such. Significantly, her testimony on this point differed substantially from Richard Dawson's and Joel Marks, the Plan's administrator, testimony at the prior evidentiary hearings in 2017. Therefore, the Court does not credit her testimony opining that nine former employees were, or are, participants in the Plan, as the competent, credible evidence shows that, since 2012, the only employee the Plan ever recognized as a participant was Richard Dawson.

If Richard Dawson is the only individual that could be construed as a Plan participant, then the Charles Schwab account cannot be said to have been a profit-sharing plan since at least 2012 because the United States Treasury has stated in § 1.401-1 that "a plan is not for the exclusive benefit of employees in general if, by any device whatever, it discriminates either in eligibility requirements, contributions, or benefits in favor of employees who are officers, shareholders, persons whose principal duties consist in supervising the work of other employees, or the highly compensated employees." *See* 26 CFR §§1.401–1(a)(3) and (b)(iv)(3). Further, "All of the surrounding and attendant circumstances and the details of the plan will be indicative of whether

it is a bona fide stock bonus, pension, or profit-sharing plan for the exclusive benefit of employees in general. The law is concerned not only with the form of a plan but also with its effects in operation." *Id*. Therefore, even if the Ms. Williamson's testimony is to be credited to the point of there being the possibility of nine Plan participants, the operation of the Plan since 2012 was that it had no Plan participants. The lack of Plan participants since at least 2012 demonstrate that deposits made into the account since at least that time were not contributions to an ERISA profit-sharing plan.

### b. Freight Revenue Failed to Adopt Amendments

Congress set forth the requirement that a Plan be established in writing so that every employee may, on examining the plan documents, determine exactly what his or her rights and obligations are under the plan and who is responsible for operating the plan. *See Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 83 (1995). The Plan's failure to update its documents is in violation of the requirement under § 401(a) that the Plan be in writing with all required amendments under the law. Further, Florida Statute §222.21 specifically references several types of written Plans (Master Plan, Volume Submitter Plan, Prototype Plan, or any other plan or governing instrument) thereby establishing that IRC compliance starts with the Plan document itself.

Ms. Williamson testified that her company amended the Plan because Freight Revenue failed to adopt amendments throughout the years as required by law (ECF No. 164 at 182:14-21). Additionally, Ms. Williamson stated that the plan had to be restated every six years in order to maintain compliance. She testified that she did not find any documents demonstrating that the Plan had ever been restated (ECF No. 164 at 192:24-25, 193:1-8). This further demonstrates that since at least 2012 the Plan was not being maintained and treated as a profit-sharing plan and thus the

funds being deposited into the account were not being deposited for the benefit of Freight Revenue employees.

### c. The Funds Deposited Exceeded Statutory Maximums

The maximum amount of money an employer is able to contribute to a profit-sharing plan is set by statute. An employer is required to report contributions to any such plan yearly on its taxes via the Form 5500. Freight Revenue reported to the IRS contributions to the Plan from 2008 through 2014 but did not claim contributions in 2015 or 2016. Despite reporting no contributions to the IRS, there were still deposits made into the account in those two years (ECF No. 166 at 92-106). Evidence was presented that money had been deposited into the Charles Schwab account in excess of what was reported to the IRS as contributions to the Plan. The difference between the employer contributions evidenced by the forms 5500 filed with the IRS and the total deposits into the Charles Schwab account from 2012 to 2016 are as follows:

| Year | Amount Deposited into Account | Excess of What was Reported to IRS |
|---|---|---|
| 2012 | $65,828.15 | $47,908.15 |
| 2013 | $73,898.32 | $48,966.32 |
| 2014 | $191,786.04 | $183,786.04 |
| 2015 | $46,293.54 | $46,293.54 |
| 2016 | $55,687.32* *total only for Jan. – Aug. | $55,687.32* |

26 CFR § 1.401(a)-2(b) provides that a plan may provide for the reversion to the employer, upon termination of the plan, of amounts contributed in excess of the limitations imposed under § 415(c). As discussed further below, the Plan documents indicate that funds contributed that are not

12

tax deductible, i.e. over the limits of §415(c) revert back to Freight Revenue. Therefore, these monies revert back to Freight Revenue.

Freight Revenue argues that by virtue of transferring the money from its own account to the Plan account, the money was transferred for the benefit of Richard Dawson and therefore is not subject to garnishment through a judgment against Freight Revenue. Implicit in that argument is that by transferring the money from Freight Revenue to the Plan, Richard Dawson's ownership of the money vested. This cannot be so.

Section 9.14(b) of the Plan Document states:

> Notwithstanding any provisions to the contrary, except Sections 3.6, 3.7, and 4.l(c), any contribution by the Employer to the Trust Fund is conditioned upon the deductibility of the contribution by the Employer under the Code and, to the extent any such deduction is disallowed, the Employer may, within one (1) year following the disallowance of the deduction, demand repayment of such disallowed contribution and the Trustee shall return such contribution within one (1) year following the disallowance. Earnings of the Plan attributable to the excess contribution may not be returned to the Employer, but any losses attributable thereto must reduce the amount so returned.

(ECF No. 82-3). Robert Penafiel, Plaintiff's expert, testified that this section of the Plan document demonstrates that the contributions made into the Charles Schwab account reverted back to Freight Revenue because the contributions were not tax deductible.

Freight Revenue averred that the funds may but do not automatically revert. This cannot be so, if the employer, that is Freight Revenue, retains the right to reclaim contributions deemed not tax deductible from the Plan then ownership cannot be said to have vested to the benefit of the Plan beneficiary, that is Richard Dawson.

Although the Court recommends a finding that all of the funds are funds of Freight Revenue and not Richard Dawson, at the very least the funds contributed in excess of those reported to the IRS automatically revert back to Freight Revenue per the terms of § 1.401(a)-2(b) and the Plan

13

document. This amounts to at least $233,584.37, which is in excess of the prior judgment of $176,749.

### d. The Account was a General Operating Account

Whirlpool offered the testimony of Mr. Penafiel who testified credibly that the account has the characteristics of a general operating account of Freight Revenue, not a profit-sharing plan. Mr. Penafiel testified that Freight Revenue deposited large amounts of Freight Revenue's money into the account, withdrew funds from the account without complying with legal requirements, and entered into loans and prohibited transactions disallowed by law for a profit-sharing plan. He also testified that Dawson is considered a "disqualified person" because he is an officer of the business, a director, a trustee, and an owner (ECF No. 166 at 150-52).

Richard Dawson, testified, when confronted with the bank statements for the Plan, that "these numbers are crazy" and that there was "too much money" deposited into the account which had been garnished further demonstrating Dawson's failure to treat the account as a profit-sharing plan (ECF No. 166 at 175-76, 177:14-19).

Accordingly, because the purported Plan has not taken the shape or form of a profit-sharing plan since at least 2012, the undersigned recommends that Defendant's Motion be DENIED.

## III. CONCLUSION

Therefore, the Court respectfully recommends that Defendant's Motion be **DENIED**, the Court make a finding that the funds in the Charles Schwab account belong to Freight Revenue Recovery of Miami, LLC. and are therefore subject to garnishment and recoverable through the writ of garnishment by Whirlpool Corporation.

Pursuant to Local Magistrate Rule 4(b) the parties have fourteen (14) days from service of this Report and Recommendation within which to file written objections, if any, with the District

Judge. Failure to timely file objections shall bar the parties from *de novo* determination by the District Judge of any factual or legal issue covered in the Report and shall bar the parties from challenging on appeal the District Judge's Order based on any unobjected-to factual or legal conclusions included in the Report. 28 U.S.C. § 636(b)(1); 11th Cir. Rule 3-1; *see e.g., Patton v. Rowell*, 2017 WL 443634 (11th Cir. Feb. 2, 2017).

**RESPECTFULLY SUBMITTED** in Chambers at Miami, Florida this 18th day of February 2020.

_____

LAUREN LOUIS
UNITED STATES MAGISTRATE JUDGE